GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
JOYCE LEAVITT
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Cellular telephone:   (415) 517-4879
Email:      Joyce_Leavitt@fd.org


Counsel for Defendant HAL


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 20–00471 YGR |
| Plaintiff, | **SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |
| v. | |
| D'MARCO HAL, | **Court:**       Courtroom 1, 4th Floor |
| Defendant. | **Hearing Date:** June 24, 2021 |
| | **Hearing Time:** 9:00 a.m. |

## I.    INTRODUCTION

Defendant D'Marco Hal will appear before this Court on June 24, 2021, to plead guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He will be sentenced immediately following his guilty plea. Mr. Hal is still a very young man at 22 years old. He was raised by an alcoholic mother, who was both abusive and neglectful towards her children, and who herself was physically abused, first by their father who was a heroin addict who was in and out of jail, and later by boyfriends, all of whom would beat their mother in front of Mr. Hal and his siblings. Mr. Hal, being the oldest sibling, took on the responsibility of caring for his two younger brothers and food and housing were constant issues. As is too often the case for those growing up in such an

environment, Mr. Hal was exposed to a number of adverse childhood experiences (ACE's) including violence, neglect, alcoholism and drug addiction, food and housing insecurity, and other dysfunction. Mr. Hal desperately wants to change his life. At the time of the offense, Mr. Hal had enrolled in barber college and was also caring for his son. However, he wanted to visit people who had been close to his brother, Deangelo, who died while Mr. Hal was in custody even though he had previously been shot in that neighborhood and did not feel safe there. He possessed a firearm in order to feel safe. As he told the probation officer, he "should have been home." Instead, Mr. Hal will plead guilty to a new crime and he has served almost one year in custody thinking about his poor choices.

The probation officer who wrote the Presentence Report (PSR) recommends that the Court vary downward from the advisory guideline range of 37-46 months, and impose a sentence of 30 months custody. PSR, Sentencing Recommendation. The government agrees that a custodial sentence is appropriate but makes no specific recommendation as to how much time is appropriate. *See* Government's Sentencing Memorandum ("Govt. Memo") at p.2.  Mr. Hal agrees that a downward variance is appropriate but asks the Court to vary further and impose either a custodial sentence of 12 months plus one day (which would effectively be a "time served" sentence), or a sentence of five years of probation with a condition of home detention for whatever period of time the Court deems appropriate.

A sentence of twelve months plus one day custody is consistent with the government's recommendation that the Court impose a custodial sentence. On the other hand, imposition of a five year term of probation is more onerous on Mr. Hal in that it would allow the Court to impose five, rather than three, years of supervision and expose Mr. Hal to the same 37-46 month guideline range (and statutory maximum of ten years imprisonment) that he faces today, were he to violate his probation at any time during those five years. A defendant who violates probation faces resentencing under the original sentencing guidelines and statutory maximum, while penalties for a violation of supervised release is limited to a maximum of two years custody and a considerably lower guideline range. Thus, requesting a sentence of probation in lieu of a custodial sentence of 12 months plus one day only makes sense for an individual who has the potential and motivation to succeed. Mr. Hal's letter to the Court, as well as the letters and statements of others who know him well, indicate that

1   Mr. Hal should be given the opportunity to demonstrate this to the Court. However, should the Court

2   determine that imposition of a custodial sentence is more appropriate (as requested by the

3   government), a sentence of 12 months plus one day is sufficient but not greater than necessary. It is

4   also a sentence which is consistent with the government's sentencing recommendation. Further, a

5   period of home detention could still be imposed as a condition of supervised release, should the Court

6   determine that this additional restriction is warranted

7       Either a custodial sentence of 12 months plus one day or a sentence of five years probation is

8   sufficient, but not greater than necessary to account for the sentencing factors set out in 18 U.S.C.

9   §3553, including Mr. Hal's history and characteristics, his youth, the nature and circumstances of the

10  offense, and the need to avoid unwarranted disparities among other factors. Intensive rehabilitative

11  programming, including group and individual counseling, drug treatment, cognitive behavioral

12  therapy, meetings and employment training is a far more effective tool in combating Mr. Hal's

13  chaotic and dysfunctional upbringing and reducing the possibility of recidivism. While the Court may

14  determine that a custodial sentence is appropriate in this case, a sentence of five years probation

15  carries a very large stick because the imposition of 37 – 46 months custody and up to ten years

16  imprisonment still hangs in the balance, should Mr. Hal not be successful on supervision.

17      Mr. Hal files this sentencing memorandum in support of his sentencing request. Attached as

18  exhibits to the sentencing memorandum are (1) letter from D'Marco Hal (Exhibit A); (2) letter from

19  Shanvoni Keeton (Exhibit B); (3) letter from DJhonnay Jackson (Exhibit C); (4) letter from Javier

20  Jimenez (Exhibit D); (5) Adverse Childhood Experience (ACE) Questionnaire completed by

21  D'Marco Hal (Exhibit E); (6) Newspaper Article regarding the accidental death of Hal's brother

22  (Exhibit F); (7) Photos of D'Marco Hal, Jeresia Caldwell and their son D'Marco (Exhibits G-1, G-2

23  and G-3). Also filed concurrently are Declaration of Madeline Larsen in Support of Sentencing

24  Memorandum and Downward Variance (Larsen Decl.) and Declaration of Joyce Leavitt in Support of

25  Sentencing Memorandum and Downward Variance (Leavitt Decl.)

26  **II.    STATEMENT OF FACTS**

27      **A.    Personal Background**

28      D'Marco Hal is a 22 year old young man who was raised primarily in Oakland by his mother

after his father left when he was seven years old. PSR at ¶40. Mr. Hal's father was a heroin addict who was in and out of custody when Mr. Hal was growing up, and when he was around, he was physically abusive to Mr. Hal's mother, as well as to Mr. Hal and his brothers. *Id*. at ¶¶40-42. Mr. Hal remembers a particular instance when his father dragged his mother into the bathroom and beat her with one of his brother's toys. *Id*. at ¶41. According to a complaint filed with the Alameda county social services agency in 2004, when Mr. Hal was just six years old, "the children were exposed to domestic violence, and the father was violent with the children, including having hit the 4 year old's head against a bedpost." Leavitt Decl. at ¶6. The neglect and abuse which was suffered by Mr. Hal and his younger brothers was both chronicled in the social services agency complaint and juvenile court records, and corroborated by Mr. Hal's aunt, Shameeka Hayes, and others. *See, e.g*., Leavitt Decl. at ¶5; Larsen Decl. at ¶¶3-8.

According to Mr. Hal's aunt, Mr. Hal had a "rough childhood – really rough." *Id*. at ¶¶3-8. His mother was 16 years old, and he witnessed her being abused by his father as well as by boyfriends including one boyfriend who left her with broken bones. *Id*. at ¶5. Mr. Hal's mother was often homeless, and if not homeless, just moving from place to place. *Id*. at ¶5. She was a heavy drinker and at one point she was on drugs. *Id*. Furthermore, Mr. Hal reported that he was around 10 years old when he realized that his mother had an alcohol problem. PSR at ¶42. She would constantly drink in front of her children. *Id*. She would often sleep for several days at a time. *Id*. Mr. Hal and his brothers would dump the alcohol when she was not watching. *Id*. On one occasion he was caught and his mother threw noodles hot out of the microwave in his face. *Id*.

As the oldest brother, Mr. Hal took responsibility for his younger brothers from the time that he was 10 years old (in fifth grade). *Id*. at ¶43. Mr. Hal's aunt corroborated the fact that Mr. Hal cared for his younger brothers from a very young age, stating "he got them up, fed, and ready for school. He would take them to school or make sure they got on the bus." Larsen Dec. at ¶9. Mr. Hal "did the cooking and made sure they ate and that their clothes were 'nice and clean and presentable.'" *Id*. He "would also take them to church." *Id*. Sheemeka Hayes stated that she would see Mr. Hal and his brothers out on the streets of Oakland alone. *Id*. at ¶10. She further stated that "if you saw them you would wonder what they were doing on 98th Avenue without their mom. . . but. . . they would just be

1   going about their business . . . everyone knew the Hal brothers. They were always out and about." *Id*.

2   Jeresia Caldwell also described Mr. Hal as filling the role of parent to his younger siblings and

3   remembers that Mr. Hal "always had his youngest brother on his hip." *Id*. at ¶20.

4        It is not a surprise, however, that with this kind of upbringing, Mr. Hal found himself in the

5   criminal justice system at an early age.[1] When Mr. Hal was in 8th grade, he started staying with his

6   aunt, on and off, for a period of time. Larsen Decl. at ¶11. His grades improved, and he thrived with

7   the structure. *Id*. However, when the courts allowed Mr. Hal to start seeing his mother and having

8   weekend visits with her, his behavior worsened, and eventually he was not able to stay with his aunt

9   any longer. *Id*. Mr. Hall started getting into trouble again and by the time he was 18 years old, he was

10  in custody. PSR at ¶¶30, 31.

11       While Mr. Hal was in custody, his younger brother was playing with a gun and accidently shot

12  and killed himself. PSR at ¶45; Exhibit F. At the time, the family had been homeless, and Mr. Hal's

13  brother had been sleeping in cars and at friends' homes before he died. Larsen Decl. at ¶21. Mr. Hal

14  blamed himself for not being there to protect him. Mr. Hal learned about his brother's death through

15  the mother of his child when he called her from jail and was devastated. PSR at ¶45.

16       **B.   Mental Health**

17       Being surrounded by abuse and neglect, while also tasked with caring for his younger brothers,

18  unsurprisingly, affected Mr. Hal's mental health. A psychological evaluation prepared in 2012 stated

19  "It is clear that the trauma . . . has left a lasting affect on D'Marco . . . [who] was very parentified and

20  . . . made to be responsible as the caretaker of his younger siblings." Leavitt Decl. at ¶3. The report

21  further stated that Hal "experience[d] symptoms of depression, low self-esteem, withdrawal and

22  trauma history" and concluding that "the lack of consistency by his mother, her repeated history of

23  being in violent and abusive relationships, and inability to parent effectively, appears to have

24

25

26  [1] Mr. Hal has a juvenile offense from when he was 12 years old, which is described in the PSR at
    ¶27. A probation report prepared at the time described the living situation as "troubling," and noting
27  that "four families and a total of 16 individuals were living in a two bedroom home." Leavitt Decl. at
    ¶4.  All of the minors involved in the offense, including a 16 year old co-defendant, were staying at
28  the house. *Id*. It is unclear whether all adults staying there were abusing substances like Mr. Hal's
    mother at the time but it would not be a stretch to presume that this was essentially a flop house with
    little or no supervision.

SENTENCING MEMORANDUM
*HAL*, CR 20–00471 YGR

1   profoundly affected D'Marco." *Id.* The evaluator recommended "intensive, long term therapy to deal

2   with his family dynamics and exposure to trauma." *Id.* Although he had weekly counseling for two to

3   three months when he was around 12 -14 years old, PSR at ¶55, Mr. Hal did not have intensive, long

4   term therapy to address the ongoing, more complicated issues.

5        Mr. Hal was also seriously traumatized by the death of his brother who was two years his

6   junior. PSR at ¶45. Growing up, Mr. Hal had protected and cared for his younger brother as best he

7   could. He was in custody at the time of his brother's death and was so devastated by the news that he

8   contemplated suicide. *Id.* He felt guilty and distraught that he had been unable to protect his younger

9   brother. PSR at ¶55. Almost four years have passed since Mr. Hal's brother's death. Exhibit F. Mr.

10  Hal has never received mental health counseling to address this trauma and it continues to affect him.

11  *Id.*; *See also* Larsen Decl. at ¶21 ("Hal was heavily impacted by the death of his brother and . . .

12  would benefit from therapy to help . . . with his deep grief.")

13       Undoubtedly, Mr. Hal's adverse childhood experiences have shaped him, as he continues to

14  struggle with the very heavy burdens which were placed on him starting when he was a very young

15  child. This ongoing trauma also contributed to the offense conduct in that Mr. Hal felt compelled to

16  return to the same neighborhood where his brother, Deangelo died, and visit with Deangelo's friends,

17  in order to feel connected to the little brother that he lost so suddenly. PSR at ¶14 (Hal "missed being

18  around the people he knew and knew his deceased brother as well."). Mr. Hal connected with old,

19  bad influential friends, and felt the need to carry a gun because he was visiting an area where he had

20  previously been shot. *Id.* Mr. Hal recognizes the connection between the trauma and the current

21  offense. *Id.* He is asking for counseling and treatment. Exhibit A. All who know Mr. Hal describe

22  him as a caring friend, a person with a big heart and an individual with talent and potential. *See, e.g.*

23  Exhibit B, Exhibit C, Larsen Decl. at ¶¶14, 15, 22, 24. Mr. Hal needs programming and treatment to

24  address his mental health issues so that he can continue to be an asset to his friends and family but

25  also law-abiding.

26       **C.    Future Goals**

27       Although Mr. Hal is just 22 years old, his letter to the Court demonstrates that he has insight

28  into why he committed the offense, how his actions have failed those who depend upon him, and

what his goals are for the future. Exhibit A. Mr. Hals writes:

> I'm currently enrolled in barber & cosmo college. I've asked myself the same question you are probably thinking. Why give up something that can be looked upon as an achievement and a career to be sitting in jail with people who don't care about their own lives. The only answer I can come up with is the way I grew up and the toxic environment I've been exposed to at a young age installed in my mind certain tools to survive were [sic] im from. A lot of people don't grow to see my age in Oakland. We lack on role models & inspiration . . . when I make a mistake its not because I don't care . . . I have real goals and real responsibilities. My son & his mother looks at me for guidance, stability and protection and I continue to fail them. My mother lost my little brother 4 years ago . . . she clearly needs me and I failed her. I have a G.E.D. and was soooo proud of myself when I got it, but the messed up part about it is I can't do nothing in jail with a G.E.D. Those don't matter in here. I turn 23 years old in July and can't even say I've been out of jail for a full year since I was 13 . . . my little brother is gone and I can't even consider my life as living for him and my baby brother goes to college next year and I've never been to 1 of his football games . . . im done with coming back and forth to jail. Im not my father im better than him and one day I will be able to prove it.

Exhibit A.

After he is released from custody, Mr. Hal plans to finish the barber school & cosmetology college which he had enrolled in prior to his arrest. PSR at ¶50. Mr. Hal initially cut his friend's hair after watching YouTube videos because his friend couldn't afford a haircut the day before school started. Exhibit B. After he had enrolled in barber college, Mr. Hal's aunt overheard one of his teachers at the barber college complimenting Mr. Hal stating that "he had a natural knack for doing hair." Larsen Decl. at ¶13.

Mr. Hal also hopes to move to Las Vegas, where his grandmother and youngest brother live, so that he can get away from the bay area where he has struggled, and be closer to his support system. Jeresia Caldwell, the mother of Mr. Hal's son, has indicated that she plans to move to Nevada with Mr. Hal and their son so that they can set up a new life there. Larsen Decl. at ¶25.

Most important to Mr. Hal, he intends to be a good role model and father to his son. Exhibit A ("Im not my father im better than him and one day I will be able to prove it."). In his conversation with the probation officer, Mr. Hal indicated that listening to his son's voice every day has kept him going while in custody. *Id*. at ¶45. By all accounts, Mr. Hal is a dedicated and caring father. Exhibit B ("D'Marco is. . . one of the best dads I've ever seen. Whenever I call him, his son is right by his side."); Larsen Decl. at ¶12 (Mr. Hal "is a great father to his son. . . teaches him 'all the little things'

he needs to do . . . tries to be present and spend time with him. . . does the things that a parent does with his child. . . his son . . . is his driving force."); Larsen Decl at ¶23 ("D'Marco is a great dad. I'm amazed."). According to Jeresia, Mr. Hal was incarcerated when his son was born, but came home and "dedicated himself to his son." *Id*. Jeresia stated that Mr. Hal loves being a father and wants to take good care of her and his family. *Id*. The pictures of Mr. Hal and his family, and the expression on Mr. Hal's face as he holds his child, make it clear how much he adores him. Exhibit G1-3. Mr. Hal's son is a powerful motivation for Mr. Hal to stay on track with programming and treatment.

## III.   DISCUSSION

### A.   A Sentence of Twelve Months Plus one Day Custody or Five Years Probation is Sufficient But Not Greater Than Necessary

The Supreme Court's decisions over the last decade have dramatically altered the district court's role at sentencing.  *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  Taken together, these cases make it clear that district court judges now have the ability – as well as the duty – under 18 U.S.C. § 3553 to exercise judgment and discretion in arriving at a sentencing determination.  Although "district courts still 'must consult [the] Guidelines and take them into account when sentencing,'" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 543 U.S. at 224), they "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50 (citing *Rita v. United States*, 551 U.S. 338 (2007)).  Furthermore, the guideline range may not be weighed more heavily than any other statutory factor.  *Gall*, 552 U.S. at 50; *Carty*, 520 F.3d at 991.

The Court must consider the advisory guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 USC § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient but not greater than necessary," to comply with the purposes of 18 USC § 3553(a), the Court must consider the need for the sentence imposed to (A) reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant. 18 USC § 3553(a)(2).

Within the last few years, there has been widespread recognition that programming and

treatment may be a more effective way to address recidivism than prolonged custody. For example, the bi-partisan enactment of the First Step Act in December 2018, which provides for incentives for individuals to participate in increased programming to reduce custodial sentences and underscores the fact that even in politics, where there has been little consensus on anything, there has been recognition across political lines that rehabilitative programming is a more effective way to reduce recidivism than incarceration.

Those who know Mr. Hal can attest to the fact that he has potential to change, but requires assistance. *See, e.g.* Larsen Decl. at ¶¶14-16, 25; Exhibit C; Exhibit D. In light of Mr. Hal's potential and desire to change, a downward variance to a sentence of 12 months plus one day of custody or five years probation (either of which can be combined with a condition of home detention), with a focus on programming rather than additional custody, is appropriate.

### B.    Mr. Hal's History and Characteristics Warrant the Requested Variance

Under 18 U.S.C. § 3553(a), Mr. Hal's history and characteristics should also be considered. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987)(O'Connor, concurring). Furthermore, the Ninth Circuit has determined that lack of guidance as a youth may be mitigating factors which render a defendant less culpable. *United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001). In this case, it is irrefutable that Mr. Hal lacked guidance as a youth and his offenses are directly attributable to his disadvantaged youth. As described above, Mr. Hal grew up on the streets, and was exposed to extreme violence, homelessness, and the lack of a positive parental influence. He was left to care for his younger brothers and often had to scrounge to get them enough food to eat. Lenity is appropriate.

Mr. Hal's diminished capacity should also be considered in mitigation. The guidelines have long recognized that a below sentence is warranted when someone commits an offense while suffering from significantly reduced mental capacity. *See, e.g.* USSG § 5K2.13, *United States v. Cantu*, 12 F.3d 1506, 152, 1516 (9th Cir. 1993) ("The goal . . . is lenity towards defendants whose

ability to make reasoned decisions is impaired"); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) (four level departure based on depression). Here, Mr. Hal suffers from ongoing trauma. In *Lewinson*, the court departed by four levels based upon the defendant's depression. Here, a variance based upon Mr. Hal's reduced mental capacity is equally appropriate.

Moreover, scientists increasingly observe connections between childhood trauma like Mr. Hal's and neurological deficits. There is a growing body of peer-reviewed studies linking Adverse Childhood Experiences (ACEs) with long-term changes in the brain. Anda, Felitti, et. Al. *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, Eur. Arch. Psychiatry Clin. Neurosci. 2006 April; 256(3) 174-186[2] (concluding that "the graded relationship of the ACE score to 18 different outcomes[3] in multiple domains theoretically parallels the cumulative exposure of the developing brain to the stress response with resulting impairment in multiple brain structures and functions.") Moreover, an article in *The Atlantic* discussed this research, noting the pioneering work of physicians Anda and Felitti cited above:

> Unpredictable childhood trauma has long-lasting effects on the brain. Studies have shown that people with adverse childhood experiences are more likely to suffer from mental-and physical health disorders, leading people to experience a chronic state of high stress reactivity. One study found that children exposed to ongoing stress released a hormone that actually shrank the size of the hippocampus, an area of the brain that processes memory, emotion, and stress management . . . 'Chronic, unpredictable stress is toxic when there is no reliable adult,' said Donna Jackson Nakazawa, the author of Childhood Disrupted and a science journalist who focuses on the intersection of neuroscience and immunology.

Cindy Lamonthe, *When Kids Have to Act Like Parents, It Affects Them for Life*, The Atlantic, October 26, 2017.[4] This was clearly the case with Mr. Hal, who suffered a number of ACE's and scored 9 out of 10 on the ACE questionnaire. Exhibit E. The ACE's which Mr. Hal suffered include abuse, neglect, household dysfunction, alcoholism and other factors. Exhibit E.

Unless or until it is treated, childhood trauma will continue to affect decision making later in

---

[2] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3232061/
[3] These 18 areas were subcategories of the following: Mental Disturbances, Somatic Disturbances, Substance Abuse, Impaired Memory of Childhood, Sexuality, and Perceived Stress.
[4] Available at https://www.theatlantic.com/family/archive/2017/10/when-kids-have-to-parent-their-siblings-it-affects-them-for-life/543975/

life:

> [I]n a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions.

Burch, Audra, *A Gun to His Head as a Child, In Prison as an Adult*, NEW YORK TIMES (October 15, 2017). It is often repeated by courts that childhood trauma is not an excuse for an adult's behavior and that a grown person has plenty of time to decide what type of adult he should be. However, childhood trauma does not have an expiration date. Indeed, trauma is a major factor "that shapes . . . criminal behavior in adulthood." *Id*. It is a "huge factor within the criminal justice system."

Studies also demonstrate that counseling as well as cognitive behavioral programs are the most effective ways to address those deficits. Counseling and directly addressing the trauma is a far more effective way to reduce recidivism than imprisonment. Based upon all of this research, a variance and imposition of either a custodial sentence of 12 months plus one day or a term of probation is appropriate.

### C.      Mr. Hal's Youth Warrants A Variance

Mr. Hal was just 22 years old at the time of the offense in this case. He will be sentenced approximately one week before he celebrates his 23rd birthday on July 11.  Although people are deemed adults when they turn 18 years old, the U.S. Sentencing Commission ("U.S.S.C.") has recognized neurological research that shows brain development is not fully realized in most people until they turn 25 years old.  More specifically, researchers have found that the prefrontal cortex of the brain—which "is utilized in impulse control, emotional reactions, executive function and decision making"—is the last part of the brain to develop.  It "is not complete by the age of 18…development continues into the 20s" and "most researchers reference 25 as the average age at which full development has taken place."[5]  In other words, research shows that the brain of a defendant who commits a crime at the age of 22 is undeveloped.

The Supreme Court has repeatedly recognized that "because juveniles have lessened culpability

---

[5] *See* United States Sentencing Commission, "Youthful Offenders in the Federal System," p. 6, 7 available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

they are less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010). It has abolished the death penalty and life without parole sentences for all juveniles. *See Roper v. Simmons*, 543 U.S. 551 (2005); *Miller v. Alabama*, 567 U.S. 460 (2012). The Supreme Court reasoned that because "juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 569-70). While a "juvenile is not absolved of responsibility for his actions…his transgression 'is not as morally reprehensible as that of an adult.'" *Graham*, 560 U.S. at 68 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)). Because of these salient factors, "it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects . . . transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id*.

While Mr. Hal's young age is not an excuse for his actions in this case, his young age is mitigating. In this case, there is reason to hope that with the resources and stability provided to him, Mr. Hal will become a productive, law-abiding adult. His letter shows insight into what has caused him to make such bad decisions. Exhibit A. In the letter, Mr. Hal also discusses his goals and what he is doing to better himself. *Id*. What Mr. Hal wants most is to be a father and constant presence in his son's life, in contrast to his own father who was mostly absent, but also violent towards his children when he was present. Exhibit A. By the time of this sentencing, Mr. Hal will have missed another Father's Day away from his son. While he has no one to blame but himself, he is determined to do better.

Mr. Hal's conduct in this case is exemplary of a "juvenile offender" whose crime reflects "transient immaturity" rather than of "irreparable corruption." His youth is a mitigating factor for this Court to consider and a sentence of five years probation with home detention (which carries the possibility of a far more severe sentence should Mr. Hal not be successful) is appropriate. It would mean that Mr. Hal is supervised by the Courts until he is 28 years old and provide five years to the Court during which he can demonstrate that his actions were the result of "transient immaturity."

1

**D.      Nature and Circumstances of the Offense**

2      Mr. Hal pled guilty to a violation of 18 U.S.C. § 922(g)(1) – felon in possession of a firearm

3  and ammunition. As discussed above, this is not a crime of violence and Mr. Hal did not intend to use

4  the firearm to commit crimes of violence. Rather, Mr. Hal has been traumatized and possessed the

5  gun because he was afraid for his safety but, yet, felt compelled to go to an area where he felt unsafe

6  in order to connect with friends of his deceased brother. Mr. Hal is aware that he needs to address that

7  trauma and cannot, under any circumstances, continue to possess a firearm in the future.

8      The government argues that this is a serious offense because of the type of weapon and fact that

9  there were children in the car. Govt. Memo at p.6. Mr. Hal does not dispute these facts. However, it

10  was not the case that Mr. Hal and the driver were headed out to the streets or going to associate with

11  others. He was headed home. Mr. Hal was on his way home to his mother's house and had gotten a

12  ride from a friend who picked him up with his two children in the back seat. The car was pulled over

13  while the driver was giving Mr. Hal a ride home.

14      Moreover, Mr. Hal's criminal history does not include violence. It is true that at 22 years of

15  age, he has amassed a handful of convictions which place him in criminal history IV. But Mr. Hal is

16  still young and has the potential to turn his life around with the assistance of the probation

17  department. He is determined to put his days of cycling in and out of jail behind him. For these

18  reasons, the nature and circumstances of the offense do not undermine Mr. Hal's requested sentence.

19  A sentence of 12 months plus one day of custody is also consistent with the government's

20  recommendation that Mr. Hal be sentenced to a custodial sentence.

21

**E.      The Need to Avoid Unwarranted Disparity**

22      In fashioning an appropriate sentence in this case, the Court must avoid unwarranted sentencing

23  disparities among defendants with similar records who have been found guilty of similar conduct. 18

24  USC § 3553(a)(6). *See also United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009).

25  The need to avoid unwarranted disparity is something that the courts look to in determining what is

26  appropriate. In this case, Mr. Hal will plead guilty to being a felon in possession of a firearm. In

27  determining an appropriate sentence, the Court may compare him with similarly situated defendants

28  in determining the appropriate sentence.

A sentence of 12 months plus one day custody or five years probation would not lead to unwarranted sentencing disparities.  Other defendants in the district convicted of being a felon in possession of a firearm—including some defendants facing higher advisory Sentencing Guideline ranges—have received probationary sentences.  What does distinguish Mr. Hal from those listed below is that the individuals listed below were released on bail and able to prove themselves prior to sentencing, whereas Mr. Hal did not have that opportunity. However, Mr. Hal can demonstrate to the Court that he needs no further time in prison as well, should the Court now give him the opportunity.

| Client Initials | Case No. | Charge(s) | USSG Range | Sentence | Pretrial Custody |
|---|---|---|---|---|---|
| L.A | 19-0078 (JST) | Felon in possession | 37-46 | 5 years probation plus 6 months home detention after deferring sentence for 1 year | 3 days |
| D.G. | 17-20-CRB | Felon in possession | 46-57 | Time served after sentencing deferred for a year | 1 day |
| J.B. | 19-258 PJH | Felon in possession | 33-41 | 5 years probation | 7 days |
| O.C. | 15-438-RS | Felon in possession | 30-37 | 5 years probation | 14 days |
| A.C. | 16-511-VC | Felon in possession (2 counts) | 168-210 | 5 years probation | 6 days |
| S.E. | 14-43-JST | Felon in possession | 37-46 | 5 years probation | 1 month |
| A.M. | 18-416 JD | Felon in possession | 37-46 | Time served after sentencing deferred 6 months | 3 weeks |
| R.S. | 17-256 JD | Felon in possession | 30-37 | Time served after sentencing deferred for a year | 3 days |

Even if the Court is not fully convinced that Mr. Hal has demonstrated his ability to change such that a "time served" sentence would be appropriate, a sentence of five years probation would achieve the same result as a deferred sentencing in that Mr. Hal will still face the advisory guideline range of 37-46 months and up to ten years imprisonment if he appears before the Court during that five year period. Under these circumstances, any additional sentence of confinement at this time would be greater than necessary to achieve the goals of sentencing.

**F.    Obtaining Treatment in the Most Effective Manner**

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it."  *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)).  Furthermore, "Congress intended supervised release to assist individuals in their transition to community life. Supervised release

1   fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*,

2   529 U.S. 53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)).  A sentence of 12 months custody plus

3   one day or five years of probation will allow Mr. Hal to continue to obtain treatment and program

4   while he is out of custody, with the assistance of his probation officer. Mr. Hal is an excellent

5   candidate for the re-entry court program, the Courage to Change class, counseling, and any other

6   treatment recommended by his probation officer. No additional time in custody at this time is

7   warranted or needed in order for Mr. Hal to obtain treatment in the most effective manner.

8   **IV.  CONCLUSION**

9       For the reasons described above, Mr. Hal respectfully requests that the Court sentence him to a

10   term of 12 months plus one day custody or five years probation (either of which can be accompanied

11   by a term of home detention).

12

13       Dated:      June 18, 2021                          Respectfully submitted,

14                                                                      GEOFFREY A. HANSEN
                                                                         Acting Federal Public Defender
15                                                                      Northern District of California

16                                                          _____/S_____

17                                                          JOYCE LEAVITT
                                                                Assistant Federal Public Defender

18

19

20

21

22

23

24

25

26

27

28